## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **GOVERNMENT BENEFITS** | ) | |
| **ANALYSTS, INC., et al,** | ) | |
|     **Plaintiffs/Counterclaim Defendants,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GRADIENT INSURANCE** | ) | |
| **BROKERAGE, INC., et al.,** | ) | **CIVIL ACTION** |
|     **Defendants/Counterclaim Plaintiffs/** | ) | **No. 10-2558-KHV** |
|     **Third Party Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GALEN JONES, individually, et al.** | ) | |
|     **Third Party Defendants.** | ) | |

## MEMORANDUM AND ORDER

This lawsuit arises from a business relationship between plaintiffs – Government Benefits Analysts, Inc. and Government Benefits Association, Inc. – and defendants – Gradient Insurance Brokerage, Inc., Gradient Financial Group, LLC, U.S. Benefits Analysts, LLC, U.S. Benefits Advocates, LLC and U.S. Benefits, LLC.  Plaintiffs allege that defendants violated the Lanham Act, 15 U.S.C. § 1125(a) and (d), and the Kansas Trade Secrets Act, Kan. Stat. Ann. §§ 60-3320 et seq. Plaintiffs also assert common law trademark infringement, breach of contract and tortious interference with existing contractual relationships, prospective business relationships and an attorney-client relationship.  See Second Amended Complaint (Doc. #56) filed October 18, 2011. Three defendants – Gradient Insurance Brokerage, Inc., Gradient Financial Group, LLC, and American Benefits Advocates, LLC – have filed counterclaims against Government Benefits Analysts, Inc. and Government Benefits Association, Inc., and third-party claims against Galen Jones and American Military Benefits Group, LLC, alleging misappropriation of trade secrets and tortious interference with contracts and business relationships.  Gradient Insurance Brokerage has also filed

additional counterclaims against Government Benefits Analysts, Inc. and Government Benefits Association, Inc., and additional third-party claims against Galen Jones alleging breach of fiduciary duty, fraud, negligent misrepresentation and unjust enrichment.

This matter is before the Court on <u>Third-Party Defendant American Military Benefits Group LLC's Motion To Dismiss</u> (Doc. #58) filed October 28, 2011.  Specifically, American Military Benefits Group argues that the Court lacks personal jurisdiction over it.  For reasons set forth below, the Court finds that the motion should be overruled.

## **<u>Legal Standards</u>**

Rule 12(b)(2), Fed. R. Civ. P., governs motions to dismiss for lack of personal jurisdiction. Third-party plaintiffs bear the burden of establishing personal jurisdiction and at this stage of the litigation need only make a prima facie showing.  <u>Dudnikov v. Chalk & Vermilion Fine Arts, Inc.</u>, 514 F.3d 1063, 1069-70 (10th Cir. 2008).  Third-party plaintiffs may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over third-party defendant.  <u>TH Agric. & Nutrition, LLC v. Ace European Grp. Ltd.</u>, 488 F.3d 1282, 1286 (10th Cir. 2007).  To the extent they are uncontroverted, the Court must accept the well-pleaded allegations of the third-party complaint.  <u>Wenz v. Memery Crystal</u>, 55 F.3d 1503, 1505 (10th Cir. 1995).  The Court resolves any factual disputes in favor of third-party plaintiffs.  <u>Wenz</u>, 55 F.3d at 1505.  If third-party plaintiffs make a prima facie showing of personal jurisdiction, third-party defendant must "present a compelling case demonstrating that the presence of some other considerations would render jurisdiction unreasonable."  <u>Dodson Int'l Parts, Inc. v. Altendorf</u>, 181 F. Supp.2d 1248, 1251 (D. Kan. 2001).

**<u>Facts</u>**

The counter claim/third-party complaint may be summarized as follows:

Gradient Insurance Brokerage, Inc. ("GIB") is a Kansas corporation with its principal offices in Shoreview, Minnesota.  Gradient Financial Group, LLC ("GFG") is a Minnesota limited liability company with its principal offices in Shoreview, Minnesota.  American Benefits Advocates, LLC ("ABA"), formerly known as U.S. Benefits, LLC, is a Minnesota limited liability company with its principal offices in Topeka, Kansas.

Government Benefits Association, Inc. ("GB Association") is a Kansas corporation. Government Benefits Analysts, Inc. ("GB Analysts") is a Delaware corporation.  Galen Jones is a Kansas resident.  At all times material to this matter, GB Association and GB Analysts operated out of Jones' residence in Leawood, Kansas.  American Military Benefits Group, LLC ("AMBG") is a Nevada limited liability company with its principal place of business in Texas.

GIB is a field marketing organization ("FMO") that distributes and markets insurance products through a nationwide network of financial professionals and insurance producers.  GIB provides services to financial professionals and insurance agents (collectively, "GIB Producers"). The services include office support, marketing tools, product education and training.  In exchange, GIB Producers enter contracts to sell insurance products offered by insurance carriers through which GIB is contracted and appointed.  GIB is a party to the contracts between the GIB Producers and the insurance carriers.  GIB receives override commissions from an insurance carrier when a GIB Producer sells that carrier's insurance product.

The FMO business is extremely competitive.  GIB therefore must maintain and guard its contractual relationships with its sales force – the GIB Producers – and makes every reasonable effort to keep confidential its relationships with the GIB Producers.

In 2007, GIB implemented an educational and marketing program (the "GIB VA Program") to train GIB Producers to help veterans apply for benefits from the Veterans Administration. The GIB program also provided a method for GIB Producers to meet potential clients. When it implemented the VA Program, GIB knew that Jones was working with one of GIB's competitors to market another VA benefits program. In late 2007, a GIB representative asked Jones if he would work as a consultant with GIB to market the GIB VA Program and to train GIB Producers. Jones represented that he had VA benefits expertise. GIB and Jones orally agreed that Jones, through his entity, GB Association, would consult with GIB exclusively to market the GIB VA Program and to provide training and ongoing support for GIB Producers (hereinafter, "the Consulting Agreement"). Jones and GB Association agreed not to work as consultants with any other FMOs. In exchange, GIB agreed to pay consulting fees to Jones and GB Association. Jones then created and began operating GB Analysts, which entered into a consulting relationship with GIB, subject to the terms and conditions of the Consulting Agreement. GIB provided Jones and GB Analysts access to GIB's operational infrastructure, GIB's client list, marketing programs and other trade secrets and confidential proprietary information. Jones and GB Analysts agreed to work exclusively with GIB to market a VA program and to maintain the confidentiality of GIB's trade secrets and confidential information, including the GIB's client list.[1]

Initially, GIB collaborated with Jones to create the first version of the GIB VA Program. GIB implemented a nationwide marketing strategy for the GIB VA Program.[2] Beginning in 2008,

---

[1]   Although Jones had previously marketed a similar VA program with another FMO, the parties agreed that Jones would not merely implement a VA benefits program at GIB, but that he would help GIB to improve its own customized and proprietary VA Program.

[2]   GIB paid for all marketing and program expenses of the GIB VA Program. GIB (continued...)

GIB invited insurance producers to attend VA Training Seminars led by Jones at GIB offices in Topeka, Kansas.  Over the course of two to three years, GIB paid GB Analysts and Jones consulting fees totaling nearly $1,300,000.

Some time in 2009 or early 2010, Jones developed a scheme to increase GB Analyst's income at GIB's expense.  In the spring and summer of 2010, Jones secretly met with several GIB Producers in the GIB VA Program to try to convince them to partner with him in a new business venture, which was eventually named American Military Benefits Group, LLC ("AMBG").  GIB had no knowledge of or involvement in AMBG.  Jones initially told the GIB Producers that the meetings were to discuss an opportunity to increase the producers' insurance business with GIB, but this was false and misleading.  Jones held at least three secret meetings with GIB Producers: one in Dallas, Texas in April of 2010, another in Arizona in May of 2010 and a third in St. Louis, Missouri in July or August of 2010.  Jones ultimately asked Jerry Hill, one of the GIB Producers, to set up AMBG as a Nevada limited liability company.  Jones eventually outlined to GIB Producers his true intent for AMBG, explaining that AMBG would utilize a program identical to GIB's VA Program but would write its insurance business with another FMO – a direct competitor of GIB.  To participate in AMBG, a GIB Producer would be required to cancel his contracts with GIB and enter into similar contracts with a competing FMO selected by Jones.  At these secret meetings, Jones consistently explained that AMBG would not operate through GIB, and he repeatedly demanded that the others not talk to GIB about his scheme.  Jones said that when GIB caught wind of his plan regarding AMBG, "the . . . would hit the fan."

_____

[2](...continued)
exercised absolute discretion over the distribution, content and design of all marketing and program materials related to the GIB VA Program.

In August of 2010, GIB learned that GB Analysts had breached the Consulting Agreement and was actively engaged in a scheme to raid GIB's contracted sales force and take their production to another FMO.[3] GIB immediately notified GB Analysts in writing that it was terminating the Consulting Agreement.[4] After Jones received the written notice of termination, he contacted GIB on numerous occasions, claiming that he wanted to work out the differences between the parties.[5] At the same time, however, Jones, GB Analysts, GB Association and AMBG continued to conspire to raid GIB's contracted sales force and take their insurance production to another FMO.

After GIB terminated the contract with GB Analysts, Jones and his entities increased their efforts to raid GIB's contracted sales force. Individuals acting on behalf of GB Analysts, GB Association and/or AMBG, including but not limited to, Jones and Victoria Saibara, used the GIB client list to call GIB Producers to try to convince them to break their contracts with GIB and to write insurance business with another FMO. Numerous GIB Producers left GIB and took their insurance business to another FMO, causing third-party plaintiffs to incur significant losses.

---

[3]     One of the GIB Producers whom Jones had solicited to join AMBG told GIB of the scheme.

[4]     GIB terminated the Consulting Agreement with GB Analysts to protect its trade secrets and confidential information.

[5]     After GIB terminated the Consulting Agreement with GB Analysts, GIB learned that the VA had informed Jones that he was not qualified or authorized to assist individuals regarding VA benefits and that he should not purport to do so. In deciding to hire and retain Jones (through GB Analysts) as a consultant, GIB had relied upon his purported VA accreditation and VA benefits expertise. When GIB found out that the GIB VA Program was designed under the guidance of an individual who lacked accreditation and expertise that he claimed to have, it incurred significant time and expense to create a completely new VA marketing program. A separate legal entity, called American Benefits Advocates, LLC ("ABA") now operates the new VA marketing program. The new VA marketing program operated by ABA (the "ABA VA Program") is completely different from the GIB VA Program that was operated during the consulting relationship between GIB and GB Analysts. The GIB Producers whom Jones had trained as part of the original GIB VA Program had to be retrained to participate in the ABA VA Program.

The conspiracy between Jones, GB Analysts, GB Association and AMBG caused third-party plaintiffs to lose potential commissions and potential business, resulting in more than $75,000 in damages.

On August 26, 2010, GIB filed an action in state court in Minnesota, seeking an injunction barring Jones, GB Analysts and GB Association from using GIB trade secrets and confidential information to raid its sales force (the "Minnesota Litigation").[6]  On October 14, 2010, the Minnesota state court dismissed the case for lack of personal jurisdiction over Jones and his companies.  That same day, GB Analysts and GB Association filed this lawsuit.

## Analysis

AMBG asks the Court to dismiss third-party plaintiffs' claims against it for lack of personal jurisdiction.  In determining whether a federal court has personal jurisdiction over a nonresident defendant, the Court must determine "(1) whether the applicable statute potentially confers

---

[6]      In July of 2009, GIB and GB Analysts had decided to create a trade name (d/b/a/ name) for the GIB VA Program, which was to continue operating through GIB. Jones had suggested using the name of one of his existing entities – either GB Analysts or GB Association – as the trade name for the GIB VA Program. GIB declined, partly because of GIB legal counsel's concern that using the term "government" in the name could be deemed misleading.  Instead, in August 2009, Tami Lucius, CEO of GIB, created the name "U.S. Benefits Analysts" ("USBA"), and GIB began using that as trade name for the GIB VA Program.  GIB then sought to trademark the name U.S.B.A., and retained an attorney to prepare and submit the trademark application. Jones tricked a GIB employee into requesting that the trademark application list GB Analysts, rather than GIB, as owner. Lucius, GIB's CEO, did not discover GB Analysts' attempt to misappropriate the USBA trademark until after GIB had submitted the application.  GIB then filed a competing trademark application, although it later abandoned the application because GB Analyst's actions tainted the USBA moniker.

On August 13, 2010, after learning that GBA intended to use the USBA trade name and brand for GIB's VA Program for its own purposes, GIB formed U.S. Benefits Analysts, LLC ("USBA, LLC") and U.S. Benefits Advocates, LLC.  Although GIB took steps to begin operating the GIB VA Program through USBA, LLC, it decided to abandon the USBA moniker because Jones and his companies had tainted the name through their improper actions.  USBA, LLC and U.S. Benefits Advocates, LLC were never funded or actively operated.

jurisdiction by authorizing service of process on the defendant and (2) whether the exercise of jurisdiction comports with due process." Trujillo v. Williams, 465 F.3d 1210, 1217 (10th Cir. 2006). Where the underlying action is based on a federal statute which does not specifically provide for national service of process, the Court applies state personal jurisdiction rules. See Fed. R. Civ. P. 4(k)(1)(C) (service of summons establishes personal jurisdiction over defendant when authorized by federal statute). Because the Lanham Act, 15 U.S.C. §§ 1125 et seq., does not provide for nationwide service of process, the Court looks to the Kansas long-arm statute.

## I.      The Kansas long-arm statute

Third-party plaintiffs assert that specific personal jurisdiction is proper based on the following portions of the Kansas Long-Arm Statute:

> (1) Any person, whether or not a citizen or resident of this state, who in person or through an agent or instrumentality does any of the following acts, thereby submits the person and, if an individual, the individual's representative, to the jurisdiction of the courts of this state for any claim for relief arising from the act:
>      (A) Transacting any business in this state;
>      (B) committing a tortious act in this state; . . .
>      (L) having contact with this state which would support jurisdiction consistent with the constitutions of the United States and of this state.

Kan. Stat. Ann. § 60-308(b)(1). Third-party plaintiffs primarily assert that AMBG is subject to personal jurisdiction because through its agents and instrumentalities, it committed tortious acts within the State of Kansas. See id. § 60-308(b)(1)(B). They note that an injury which occurs in Kansas as a result of a tortious act outside the state amounts to a "tortious act within the state," thus falling within the tortious act provision of the Kansas long-arm statute. Taylor v. Phelan, 912 F.2d 429, 432 (10th Cir. 1990). The party's physical presence within the state is not required. See J.E.M. Corp. v. McClellan, 462 F. Supp. 1246, 1248-54 (D. Kan. 1978) (fraudulent misrepresentations by defendant in phone call from Chicago to Kansas satisfies this provision). Further, the "agent or

instrumentality" provision of the statute encompasses nonresidents who (1) control or direct the instrumentality's acts from which the claim arises or (2) purposefully seek and foreseeably benefit from an active relationship with another entity that has transacted business in the forum that gives rise to the claim.  Energy Reserves Grp., Inc. v. Superior Oil Co., 460 F. Supp. 483, 514 (D. Kan. 1978) (subjecting nonresident subsidiary corporation to long-arm statute because it benefitted from Kansas parent corporation's contract negotiations); accord Triple A P'ship v. MPL Comm'ns, Inc., 629 F. Supp. 1520, 1523 (D. Kan. 1986) (subjecting nonresident to long-arm statute because of in-state activities of independent licensees who transacted business that benefitted defendant).

Third-party plaintiffs cite the following allegations in support of specific jurisdiction: Jones asked Hill to create AMBG in a conspiracy to misappropriate GIB trade secrets and use those trade secrets to tortiously interfere in contractual relationships and prospective business between third-party plaintiffs and GIB's contracted sales force.  AMBG then conspired with Jones, a Kansas resident, GB Association, a Kansas corporation, and GB Analysts, a corporation with its principal place of business in Kansas.  Further, the conspiracy resulted in tortious conduct that injured third-party plaintiffs, including GIB – a Kansas corporation with offices in both Minnesota and Topeka, Kansas, and ABA – a Minnesota company with its principal place of business in Kansas.

AMBG asserts that it is not subject to personal jurisdiction in the State of Kansas and argues that third-party plaintiffs "have served the wrong entity."[7]  AMBG contends that it is not connected

---

[7]     AMBG argues that third-party plaintiffs are confused by multiple entities that share the same name.  AMBG asserts that it has never held itself out as American Military Benefits Group, LLC, because it does not use a comma in its name.  Third-party plaintiffs respond assert that use of a comma in an entity's formal name "is hardly probative of whether or not it is a proper party to a federal lawsuit,  especially here, "where AMBG . . . appears confused as to whether or not its own name includes a comma."  Memorandum In Opposition, Doc. #63 at 4 n.2 (citing Schoen Affidavit, (continued...)

to Jones or his entities, pointing to affidavit statements that Jones and his related entities have no ownership interest or relationship with AMBG.  In response, however, third-party plaintiffs point to conflicting affidavit evidence that at Jones' request, Hill agreed to set up a Nevada limited liability company to facilitate the alleged conspiracy and to set up a website and online training calendar for the LLC.  On July 16, 2010, Hill then created AMBG as a Nevada limited liability company.[8]  The Court notes that for the purposes of AMBG's motion to dismiss, the Court must resolve factual disputes in favor of jurisdiction.  See Farr v. Designer Phosphate & Premix Int'l, Inc., 777 F. Supp. 890, 893 (D. Kan. 1991).

This Court has repeatedly recognized that the Kansas long-arm statute provides jurisdiction over a non-resident defendant alleged to have engaged with an in-state actor in a scheme or conspiracy that causes damages within the state.  See, e.g., Dodson Int'l P'ship, 181 F. Supp.2d at 1253-54 (prima facie evidence of conspiracy or entry into state sufficient to establish personal jurisdiction, particularly where plaintiff alleges defendant committed tortious acts injuring Kansas residents); Prof'l Inv. Life Ins. Co., Inc. v. Roussel, 445 F. Supp. 687, 696 (D. Kan. 1978) (acknowledging existence of personal jurisdiction over nonresident co-conspirators in scheme to commit business torts with foreseeable consequences in Kansas); see generally Merriman v. Crompton Corp., 282 Kan. 433, 464-65, 146 P.3d 162, 181-82 (Kan. 2006) (majority of courts have

---

[7](...continued)
Ex. C-E) (logo on AMBG current website does not include comma, although Nevada Secretary of State's online record for AMBG includes comma, as does logo used on AMBG website until at least September 22, 2010).

[8]     As of August 31, 2010, the AMBG website indicated that five individuals were scheduled to provide nearly 30 training seminars on AMBG's behalf from August of 2010 through July of 2011.

adopted conspiracy method of establishing personal jurisdiction).  Based upon the third-party plaintiffs' complaint and affidavits, the Court concludes that the alleged tortious actions of AMBG subjects it to jurisdiction under the "commission of a tortious act" provision of the Kansas long-arm statute, Kan. Stat. Ann. § 60-308(b)(1)(B).

**B.**    **Due Process**

The Court next determines whether exercise of personal jurisdiction over AMBG satisfies constitutional due process requirements.  OMI Holdings, Inc. v. Royal Ins. Co. of Cal.,148 F.3d 1086, 1090 (10th Cir. 1998); see Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).  Due process requires "minimum contacts" between the nonresident defendant and the forum state, and may be satisfied in one of two ways.  Id.  A court may exercise specific jurisdiction over a non-resident defendant where defendant has "purposely directed" its activities at residents of the forum, and the litigation results from alleged injuries that arise out of or is related to those activities.  OMI Holdings, 148 F.3d at 1090-91 (quoting Asahi Metals Indus. Co. v. Superior Court, 480 U.S. 102, 109 (1987); Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)).  Second, where there is no nexus between the forum-related activity and the injury sustained, the court may still exercise general jurisdiction if defendant's contacts are so pervasive as to confer personal jurisdiction by the continuous and systematic nature of defendant's in-state activities.  OMI Holdings, 148 F.3d at 1090-91.  In either case, defendant must reasonably be able to anticipate being haled into court in the forum state.  Burger King, 471 U.S. at 475.  Also, jurisdiction in the particular case must be reasonable so as not to offend traditional notions of fair play and substantial justice.  See World-Wide Volkswagen, 444 U.S. at 292.

Here, third-party plaintiffs argue at length that the Court has specific jurisdiction over AMBG, and also assert in passing that the Court may exercise general jurisdiction over AMBG. Neither side focuses on the general jurisdiction question, however.  Because the Court finds that it has specific personal jurisdiction it does not reach the question of general personal jurisdiction.

### A.      Specific Jurisdiction

The Tenth Circuit applies a three-part test to determine specific jurisdiction.  Dudnikov, 514 F.3d at 1071; see Sunlight Saunas, Inc. v. Sundance Sauna, Inc., 427 F. Supp.2d 1011, 1019 (D. Kan. 2006).  First, the out-of-state defendant must have "purposefully directed" its activities at residents of the forum state; and second, plaintiff's injuries must "arise out of" defendant's forum-related activities.  Dudnikov, 514 F.3d at 1071 (quoting Burger King, 471 U.S. at 472).  Taken together, the first two parts of the test determine whether plaintiff has demonstrated minimum contacts.  Third, the exercise of personal jurisdiction over defendant must be consistent with traditional notions of fair play and substantial justice.  Dudnikov, 514 F.3d at 1071 (citing Int'l Shoe, 326 U.S. at 316).

Here, third-party plaintiffs have adequately alleged that AMBG purposefully directed its activities toward Kansas and that this litigation results from injuries which arise out of or relate to those activities. See Kuenzle, 102 F.3d at 456.  Plaintiffs have alleged that Jones caused formation of AMBG as part of a conspiracy to misappropriate trade secrets and confidential information from GIB and to tortiously interfere in GIB's contractual relationships and prospective business.[9]  Further, the alleged tortious conduct harmed GIB, a Kansas corporation with offices in Topeka, Kansas.  See Dudnikov, 514 F.3d at 1076 (finding specific jurisdiction where defendants' express aim was to halt

---

[9]        AMBG Nevada acted in concert with Jones, a Kansas resident, GB Association, a Kansas corporation, and GB Analysts, a corporation with its principal place of business in Kansas.

sale in Colorado by Colorado resident by using California-based entity).  The Court finds that plaintiffs have met their burden to establish minimum contacts at this stage of the litigation.

The Court next inquires whether the exercise of personal jurisdiction would "offend traditional notions of fair play and substantial justice."  Int'l Shoe, 326 U.S. at 316.  Because third-party plaintiffs have met the minimum contacts threshold, AMBG must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Pro Axess, Inc. v. Orlux Distrib., Inc., 428 F.3d 1270, 1280 (10th Cir. 2005).  In making such an inquiry courts traditionally consider the following factors:

> (1) the burden on the defendant, (2) the forum state's interests in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effectual relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental social policies.

Dudnikov, 514 F.3d at 1080 (citing OMI Holdings, 149 F.3d at 1095); see also TH Agric. & Nutrition, 488 F.3d at 1292.

The first factor – the burden on defendant – weighs in favor of AMBG.  The cost for AMBG to litigate the action in Kansas is probably higher than it would be to litigate in Nevada.

The second factor is the interest of the State of Kansas in resolving the dispute.  Kansas has an interest providing a forum in which a Kansas corporation can seek redress for injuries.  See Battenfeld of Am. Holding Co. v. Baird, 45 F. Supp.2d. 1109, 1117 (D. Kan. 1999).  Kansas also has an interest in interpreting its own laws.  Merriman, 282 Kan. at 474, 146 P.3d at 187.  The Court finds that Kansas has a substantial interest in the present dispute.

The third factor in the reasonableness inquiry is whether third-party plaintiffs may receive convenient and effective relief in another forum.  See OMI Holdings, 149 F.3d at 1097.  Here, third-

party plaintiffs argue that they will not be able to obtain full and complete relief if they are forced to litigate their claims against AMBG in a separate forum. This factor favors third-party plaintiffs.

Next, the Court examines whether exercising personal jurisdiction would best further the interstate judicial system's interest in obtaining the efficient resolution of controversies. To evaluate this factor, courts generally consider the location of witnesses, where the underlying wrong occurred, what substantive law governs the case and whether jurisdiction is necessary to prevent piecemeal litigation. See id. The parties do not address this consideration at length, and it appears that while at least one witness – Jones – is a Kansas resident, many other witnesses are not. This consideration does not appear to favor either party. The next consideration favors AMBG, however, because at least part of the underlying wrong – the secret meetings – occurred in Texas, Arizona and Missouri. As for the governing law, plaintiff asserts that Kansas law applies, particularly the Kansas Unfair Trade Secrets Act, Kan. Stat. Ann. § 60-3320 et seq., so this consideration also favors third-party plaintiffs. The final consideration – avoiding piecemeal litigation – favors third-party plaintiffs because it would waste resources if they must file another lawsuit against AMBG in Nevada. See Dodson, 181 F. Supp.2d at 1256. Overall, the Court finds that the interests of the interstate system are best served by suit in Kansas.

The fifth factor in the reasonableness determination is the shared interest of the states in furthering fundamental substantive social policies. The Court discerns no facts which favor either party on this issue.

After reviewing all of the relevant factors, the Court concludes that exercising personal jurisdiction over AMBG will not violate traditional notions of fairness and due process. On the

current record, the Court finds that it has personal jurisdiction over AMBG as to third-party plaintiffs' claims against it.

**IT IS THEREFORE ORDERED** that Third-Party Defendant American Military Benefits Group LLC's Motion To Dismiss (Doc. #58) filed October 28, 2011 be and hereby is **OVERRULED**.

Dated this 23rd day of May, 2012 at Kansas City, Kansas.

s/Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge