## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **GOVERNMENT BENEFITS** | ) | |
| **ANALYSTS, INC., et al,** | ) | |
|     **Plaintiffs/Counterclaim Defendants,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GRADIENT INSURANCE** | ) | |
| **BROKERAGE, INC., et al.,** | ) | **CIVIL ACTION** |
|     **Defendants/Counterclaim Plaintiffs/** | ) | **No. 10-2558-KHV** |
|     **Third Party Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GALEN JONES, individually, et al.** | ) | |
|     **Third Party Defendants.** | ) | |

### MEMORANDUM AND ORDER

This lawsuit arises from a business relationship between plaintiffs – Government Benefits Analysts, Inc. and Government Benefits Association, Inc. – and defendants – Gradient Insurance Brokerage, Inc.; Gradient Financial Group, LLC; U.S. Benefits Analysts, LLC; U.S. Benefits Advocates, LLC and U.S. Benefits, LLC.  Plaintiffs allege that defendants violated the Lanham Act, 15 U.S.C. § 1125(a) and (d), and the Kansas Trade Secrets Act, Kan. Stat. Ann. §§ 60-3320 et seq. Plaintiffs also assert common law trademark infringement, breach of contract, breach of fiduciary duty and tortious interference with existing contractual relationships, prospective business relationships and an attorney-client relationship.  See Second Amended Complaint (Doc. #56) filed October 18, 2011.  This matter is before the Court on Defendants' Motion To Dismiss (Doc. #61) filed November 14, 2011.  Specifically, under Fed. R. Civ. P. Rule 12(b)(6), defendants assert that plaintiffs have failed to state a claim for breach of fiduciary duty (Counts VIII(a) and XI(a)), tortious interference with existing contractual relationships (Count IX), tortious interference with prospective business relationships (Count X) and tortious interference with an attorney-client relationship (Count

XI(b). For reasons set forth below, the Court finds that the motion should be sustained as to the breach of fiduciary claims and overruled as to the other claims.

**Legal Standards**

In ruling on a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., the Court assumes as true all well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement of relief. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim which is plausible – and not merely conceivable – on its face. Id.; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In determining whether a complaint states a plausible claim for relief, the Court draws on its judicial experience and common sense. Iqbal, 129 S. Ct. at 1950.

The Court need not accept as true those allegations which state only legal conclusions. See id.; Hall v. Bellmon, 935 F.3d 1106, 1110 (10th Cir. 1991). Plaintiffs bear the burden of framing the complaint with enough factual matter to suggest that they are entitled to relief; it is not enough to make threadbare recitals of a cause of action accompanied by conclusory statements. Twombly, 550 U.S. at 556. Plaintiffs make a facially plausible claim when they plead factual content from which the Court can reasonably infer that defendants are liable for the misconduct alleged. Iqbal, 129 S. Ct. at 1949. Plaintiffs must show more than a sheer possibility that defendants have acted unlawfully – it is not enough to plead facts that are "merely consistent with" defendants' liability. Id. (quoting Twombly, 550 U.S. at 557). A pleading which offers labels and conclusions, a formulaic recitation of the elements of a cause of action, or naked assertions devoid of further factual enhancement will not stand. Iqbal, 129 S. Ct. 1949. Similarly, where the well-pleaded facts do not permit the Court to infer more than the mere possibility of misconduct, the complaint has alleged – but has not "shown" – that the pleader is entitled to relief. Id. at 1950. The degree of specificity necessary to

establish plausibility and fair notice depends on context, because what constitutes fair notice under

Rule 8(a)(2), Fed. R. Civ. P., depends on the type of case.  Robbins v. Oklahoma, 519 F.3d 1242,

1248 (10th Cir. 2008) (quoting Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232-33 (3d Cir. 2008)).

### Facts

The Second Amended Complaint may be summarized in relevant part as follows:[1]

Plaintiff Government Benefits Association, Inc. ("GB Association") is a Kansas corporation

with its principal place of business in Leawood, Kansas.  Plaintiff Government Benefits Analysts,

Inc. ("GB Analysts"), also doing business as U.S. Benefits Analysts, is a Delaware corporation with

its principal place of business in Leawood, Kansas.  Galen Jones, a Kansas resident, is the founder,

president and sole stockholder of both GB Association and GB Analysts.  At all times material to

this matter, GB Association and GB Analysts operated out of Jones' residence in Leawood, Kansas.

Before incorporation of GB Analysts, Jones conducted business as GB Analysts.

Defendant Gradient Insurance Brokerage, Inc. ("GIB") is a Kansas corporation with its

principal offices in Topeka, Kansas.  Gradient Financial Group, LLC ("GFG") is a Minnesota limited

liability company which GIB formed in September of 2008, with its principal offices in Shoreview,

Minnesota.  GFG principals are Chuck Lucius and Tami Lucius.  GFG has an office in and does

business in the State of Kansas through U.S. Benefits Analysts, LLC ("USBA").[2]  GIB formed

USBA in August of 2010 as a Minnesota limited  liability company with its principal place of

business in Shoreview, Minnesota.  USBA is registered to do business in Kansas and has an office

---

[1]       The Court does not include conclusory statements set forth in the complaint, such as
the statement that Government Benefits Analysts and Gradient Insurance Brokerage entered into a
fiduciary relationship.  See, e.g., Doc. #56 at 114.

[2]       Through the GFG website, a person interested in a Veterans Benefit Academy is
linked to the USBA website.

in and does business in the State of Kansas.

Defendant U.S. Benefits Advocates, LLC ("USB Advocates") is a Minnesota limited liability company formed in August of 2010 with its principal place of business in Shoreview, Minnesota. USB Advocates is not registered to do business in Kansas but it has an office in and does business in the State of Kansas. Chuck Lucius and Tami Lucius are the principals of USB Advocates.

Defendant U.S. Benefits, LLC ("USB"), which recently changed its name to American Benefits Advocates, LLC, is a Minnesota limited liability company formed in September of 2010 with its principal place of business in Shoreview, Minnesota. USB is not registered to do business in Kansas but has an office in and does business in Kansas. Chuck Lucius and Tami Lucius are the principals of USB.

Between 2001 and 2005, Jones devoted hundreds of hours to research and develop a program to help veterans obtain maximum benefits under the "little-known" Veterans Affairs ("VA") Benefit Rule of 1951. The program also offered insurance and estate planning services to veterans. Jones created training programs and forms to teach insurance agents how to generate leads, conduct seminars, make client presentations and assist clients in qualifying for enhanced veterans benefits and in estate and insurance planning. Jones also created marketing plans, training manuals and marketing materials. Plaintiffs refer to Jones' program as the VA Benefits Maximization Training and Marketing System ("VA Benefits System").

Since at least 2005, Jones has used the mark and business name Government Benefits Analysts ("GBA"). At all times, Jones, doing business as GBA, used due care to protect proprietary materials from disclosure to uncontrolled third parties.[3]

---

[3]   Where the complaint refers to "Galen Jones, d/b/a Government Benefits Analysts" (continued...)

In February of 2005, Jones incorporated Government Benefits Association ("GB Association"), an insurance agency, to sell insurance products and assist other agencies in selling insurance products. The trade names and common law trademark and business names "Government Benefits Analysts" and "Government Benefits Association" became associated with Jones and had a reputation for quality.

From 2005 until 2007, Jones, doing business as GBA, worked with Financial Independence Group, Inc. ("FIG"), a field marketing organization ("FMO") that trained and appointed subagents to sell annuities and other insurance products. During this time, GBA presented the VA benefit maximization programs and sales and marketing systems to FIG agents and provided them forms and materials (including a manual) to train them to use the VA Benefits System.

During 2007, David Landwehr, a local Kansas insurance agent, introduced Jones to Chuck Lucius, president and co-owner of GIB. Landwehr had taken the VA Benefits System training from GBA. GIB and Jones agreed to discuss a potential business relationship between the parties. GIB understood and agreed that the VA Benefits System and related materials were the exclusive proprietary intellectual property of GBA and that "Government Benefits Analysts" was a valuable trade name owned by Jones.

In a meeting in 2007, Lucius on behalf of GIB and Jones on behalf of GBA and GB Association agreed that they would work together to recruit agents to contract with GIB by utilizing the VA Benefits System. GIB agreed to use its resources to call insurance agents and introduce them to the VA Benefits System and direct them to an infomercial created by GBA. GIB would make a follow-up call to the agents to schedule a call with Jones, who would further elaborate on the

--------

[3](...continued)
the Court simply uses "GBA."

marketing system and "sell" the agents on the marketing strategy. The parties would invite interested agents to a two-day training seminar conducted by GBA and hosted by GIB at its Topeka office. Each agent would pay a $995 tuition fee to Galen Jones d/b/a GB Analysts for access to the VA Benefits System, sign a Nondisclosure Agreement and receive a manual compiled by Jones, including the VA Benefits System and scripts and advertising materials which Jones had developed.[4] GIB would collect the fees and write Jones a check for the number of agents in attendance. In addition to the in-person training, GBA agreed to provide ongoing assistance to agents. GIB agreed to provide administrative and record-keeping services to support GBA efforts to market and expand the VA Benefits System to benefit both parties. GIB agreed to ensure that each agent signed the Nondisclosure Agreement and to provide providing quality control.

GIB, GBA and GB Association shared one employee, Morgan Kitchen, who had worked for GIB or its owners' previous companies for 12 to 14 years. GBA agreed to pay Kitchen $3,000 a month, to be deducted from the payments that GIB owed Jones. GIB agreed to pay the remainder of Kitchen's salary plus her health insurance costs.

GIB agreed to pay GBA half of the commissions that GIB received on sales of annuities sold by any agent whom GBA had trained. In addition, GB Association could sell annuities through its own agents using GIB as its field marketing organization; and GB Association would receive an additional share of commissions on such sales. Although the relationships created with customers through use of the VA Benefits System included the potential for selling other insurance products such as life insurance, GBA and GB Association received compensation only for sales of annuity

---

[4]     Jones granted GIB a limited license to use the VA Benefits System, but only to the extent that its use of the mark and business name would inure to GBA's benefit.

products.

GIB executed a non-compete, non-disclosure and confidentiality agreement with GBA. The parties agreed that if any party terminated the arrangement, the limited license would immediately terminate and GIB and its affiliates would immediately stop using the VA Benefits System and would also stop using the names of Galen Jones and GBA (and any d/b/a under which GBA operated) in any of its advertising, promotions, websites or other materials.

In addition to allowing GIB a limited license to use the VA Benefits Maximization Training and Marketing System, GBA worked to develop a relationship with a Topeka attorney, Scott Sexton, to help to give veterans inexpensive estate planning services. Sexton developed a network of attorneys. Sexton would draft trusts and enlist the aid of local counsel, as necessary. The cost for attorney trust services was standardized at $750.

In 2008, Jones incorporated Government Benefits Analysts, Inc. ("GB Analysts") to conduct the business which he had been conducting under the mark and business name Government Benefits Analysts. Jones was and is the sole stockholder and president of GB Analysts. Jones orally assigned to GB Analysts all right, title and interest to the VA Benefits Maximization Training and Marketing System and the business name Government Benefits Analysts and the contractual rights associated with it. Thereafter, agents signed Nondisclosure Agreements with GB Analysts.

During the course of the relationship from 2007 through 2010, GIB routinely acknowledged on its website and in promotional materials that GB Analysts, through Jones, had created the VA Benefits System, including statements that "Galen has done this for a long time," he has "created a proved program," and that "Galen is the sole reason our program is the most successful one in the industry." GIB specifically identified Jones as "the originator of this unique system" and using

Jones' photograph, encouraged agents to "Learn the Secrets of the VA Seminar from Galen Jones!"
GIB materials further stated that while VA benefits were not proprietary or unique, "the marketing,
case design, contract structure and additional components are unique to us and our program structure
is the main reason for our superiority in this market."  GIB further referred to Jones as "the president
of U.S. Benefits Analysts and the architect behind the thriving Veterans Benefit program."  It also
stated that "[w]ith a genuine desire to provide his community with a valuable service, Galen created
a power[ful] marketing program and disciplined sales system around the little-known Veterans
Affairs (VA) Benefit Rule from 1951."  Additionally, GIB handouts stated that "Galen has created
a proven program that provides a valuable service to those who served our country."

GIB directed its legal counsel, Francis J. Rondoni, and his law firm to provide legal services
and to actively represent the interests of GB Analysts, including enforcing against agents the terms
of the Nondisclosure Agreement.

In September of 2008, GIB formed Gradient Financial Group ("GFG"), which began offering
VA Benefit System training events that featured Jones.  GFG warned agents to honor the
non-compete/nondisclosure agreement.  GFG also made clear that the $1,000 tuition which each
agent paid for training was the property of Jones or his company, not GIB or GFG.

During 2009, GIB advised GB Analysts that Rondoni believed the corporate name
"Government Benefits Analysts" was limiting the VA Benefits System because some states placed
legal restrictions on use of the term "Government" in a corporate name.  Rondoni and Tami Lucius
spoke with Jones and Rondoni encouraged Jones to make a name change.  A few days later, Jones
proposed to use the name "U.S. Benefits Analysts" ("USBA") to market the VA Benefits System.
Rondoni told Jones that this could be done as a "d/b/a" without changing the corporate name of GB

Analysts.  As early as August 2009, GB Analysts began using the mark and business name "U.S. Benefits Analysts" in commerce in association with its VA Benefits Marketing System. The mark and business name U.S. Benefits Analysts were used in conjunction with the nondisclosure and non-compete agreements signed by GIB agents, on the GB Analysts website, in the VA Benefits System materials and on all other materials and correspondence of GB Analysts.  GIB referred to Jones as "the president of U.S. Benefits Analysts and the architect behind the thriving Veterans Benefit program." Each agent signed the Nondisclosure Agreement with GB Analysts d/b/a USBA. Representing the interests of GB Analysts, Rondoni sought to enforce the terms of the Nondisclosure Agreement against violating agents.

For the benefit of GB Analysts, GIB also applied to the United States Patent And Trade Office ("USPTO") to register "U.S. Benefits Analysts" as a federal trademark and business name or service mark and business name.  The application listed the owner as GB Analysts, Inc.,12120 State Line Road, Leawood, KS 66209.[5]

GB Analysts directed agents who had been licensed to use its mark and business name to begin using the new name of U.S. Benefits Analysts in all marketing and correspondence.  GB Analysts updated the website to remove the mark business name "Government Benefits Analysts, Inc." or change it to "U.S. Benefits Analysts."  GB Analysts changed its contracts, legal documents and correspondence to include the new company name U.S. Benefits Analysts, either alone or in conjunction with the GB Analysts corporate name.

Using the VA Benefits System, GB Analysts and GIB achieved extraordinary financial

---

[5]        The USPTO gave the application a number of 77915813.  The application included a copy of the U.S. Benefits Analysts website, www.gbausa.org, which listed GB Analysts' phone number, 1-888-311-8880.

success.  As of August of 2010, the average monthly compensation of GB Analysts, through its relationship with GIB, reached approximately $80,000 per month before expenses.

In July of 2010, Tami Lucius, co-owner of GIB, spoke with Jones to discuss adding an accounting service to the estate planning and trust services that Sexton was providing.  Tami Lucius had created GIB Tax Services, a subsidiary of GIB, and she insisted that Sexton charge each client an additional $350 to pay GIB Tax Services for filling out an IRS Form 709.  GB Analysts opposed the additional service and fee because many insurance customers did not even file a Form 709, and those who did could file one through their own tax advisors at a lower cost.  GB Analysts also believed that by making this demand, GIB was interfering with its attorney-client relationship with Sexton.  When GB Analysts opposed Lucius' demands regarding the Form 709, Lucius became enraged at Jones, stating that "you make a lot of money with us.  In fact you make more than Chuck and I do, not that I mind of course, but you owe us to do this and we need it."  She further stated "you know we're a team right? And if I need you to do something that's good for both of us, we're together remember."

The relationship between GB Analysts and GIB had historically been a non-exclusive oral agreement, meaning that GB Analysts was free to license the VA Benefits System to others.  During the summer of 2010, Jones suggested that the parties negotiate and commit to writing an exclusive arrangement between GIB, GB Analysts and GB Association.  GIB seemed unreceptive.  Jones also considered the possibility of further developing GB Association, his insurance agency company, as a subagent of GIB to try to earn more commissions from direct sales to customers.  GB Analysts also began developing potential new relationships for marketing annuity products under GIB.

During August of 2010, on behalf of GB Analysts and GB Association, Jones drafted a proposal to GIB that would involve building a captive agency within GIB. Jones communicated with third parties regarding his proposal and asked them to review it. Jones planned to present his proposal to GIB during late August or early September. Meanwhile, GIB apparently misunderstood Jones's actions as reflecting his intent to terminate the relationship between GB Analysts and GIB. Actually, Jones and GB Analysts never intended to compete with GIB, even though they had every right to do so; Jones was merely exploring ways to increase revenue to benefit all parties.

On August 13, 2010, GIB, Chuck Lucius and Tami Lucius formed a Minnesota limited liability company which they called "U.S. Benefits Analysts, LLC" ("USBA"). GIB formed and established USBA as a vehicle to secretly steal the valuable intellectual property rights and business of Jones, GBA and GB Association, including the VA Benefits System and business name U.S. Benefits Analysts that was being used to market the system and for which GBA had applied for trademark and business name registration.

On or about August 17, 2010, GIB (using the same lawyer who had filed the trademark and business name registration on behalf of GBA) caused USBA to file with the USPTO a fraudulent competing application for registration of the mark and business name "U.S. Benefits Analysts" for the benefit of USBA instead of GB Analysts. In August of 2010, GIB also formed U.S. Benefits Advocates, LLC ("USB Advocates"). GIB, GFG, USBA, USB and USB Advocates, or some of them, created copycat websites, using the same format and information previously used to describe the VA Benefits System, and began redirecting internet traffic to those sites. Tami Lucius then sent letters and e-mails to insurance agents stating that GIB owns, and always has owned, the mark and business name U.S. Benefits Analysts. She did so in an attempt to retain the agents and their annuity

production for GIB because the agents would naturally want to continue to use the mark and business name U.S. Benefits Analysts – which they had been licensed to use along with the VA Benefits System.

On August 24, 2010, GIB served Jones with a lawsuit filed in the State of Minnesota on behalf of GIB and USBA. The suit claimed that GIB had terminated its relationship with GB Analysts and Jones.[6] After August 24, 2010, GIB stopped paying its obligations to GB Analysts, GB Association and Jones (including payment obligations from GIB's receipt of commissions on business written before the date that GIB allegedly terminated the relationship between GIB and GB Analysts). Through their fraudulent trademark and business name registration application and the Minnesota lawsuit, GIB and USBA sought to hijack and steal GB Analysts' mark and business name, the VA Benefits System and all of the business been developed through the use thereof.

On September 14, 2010, without informing Jones, GIB, Chuck Lucius and Tami Lucius formed a Minnesota limited liability company which they called "U.S. Benefits, LLC" ("USB"). GIB formed and established USB as a further vehicle through which to steal the GB Analysts mark and business name, the VA Benefits System and all of the business developed through the use thereof. GIB placed on the internet another copycat website, www.usbenefitsllc.org, an obvious duplication of previous websites used to market the VA Benefits System.

Since August 24, 2010, despite GIB's termination of its relationship with GB Analysts, defendants and their agents have been using the VA Benefits System without the permission of GB Analysts. Also, defendants and their agents continue to use the mark and business name "U.S. Benefits Analysts" to drive agents and customers to their products and various services. The

---

[6]     GIB served Jones after inviting him to a purported business meeting.

non-compete, nondisclosure and confidentiality agreement signed by GIB and GB Analysts doing business as "U.S. Benefits Analysts" clearly prohibits GIB, its wholly-owned subsidiary USBA and their agents from continuing to use the VA Benefits System.

GB Analysts has not given GIB, USBA, USB, USB Advocates or their agents permission or authorization to use any of its trademark and business names or trade secret-protected proprietary works since the alleged termination by GIB.  Nonetheless, GIB, USBA, USB, USB Advocates and their agents have continued to use them. USBA and its affiliates are now representing to existing agents and potential consumers that the VA Benefits System, as well as the mark and business name U.S. Benefits Analysts, are property of USBA.  Further, USBA and its affiliates are requiring the same agents who previously received training from and signed the Nondisclosure Agreement with GB Analysts to sign a Program Agreement stating that USBA owns the VA Benefits System.

Insurance agents whom Jones trained have told him that they are upset with USBA and the fact that USBA is locking them out of the program unless they sign the Program Agreement. Meanwhile,  USB is assisting agents in evaluating client eligibility for services, further interfering with the relationship between GB Analysts and the agents and potential clients.

GB Analysts has been harmed as a result of defendants' continued unauthorized use of the VA Benefits System and the mark and business name "U.S. Benefits Analysts."  GB Analysts has been further harmed through the controlling and redirection of all internet traffic from the GB Analysts websites, www.gbausa.org and www.usveteransbenefits.org, to other websites including www.usbenefitsanalysts.org  and  www.usbenefitsllc.org,  by  GIB, GFG, USBA, USB, USB Advocates and their agents.

Defendants and their agents have changed the codes to a website developed for plaintiffs' benefit, www.gbausa.org.  Plaintiffs can no longer access their own website, from which Jones sent

and received emails. Defendants and their agents have refused to release the 888-311-8880 telephone number to GB Analysts. Defendants and their agents have conducted and continue to conduct a "smear campaign" against GB Analysts and Jones, thereby directly impacting the livelihood and future compensation of GB Analysts and Jones.

Defendants continue to use proprietary and confidential materials of GB Analysts, including the VA Benefits System, materials, website templates, brochures, slogans, logo, website and other trademark and business name-protected works of GB Analysts. Defendants and their agents have violated the signed agreements and continue to use, misappropriate and disclose GB Analysts confidential and proprietary business information and other protected material, to the direct harm of GB Analysts.

In October of 2010, the Minnesota court dismissed for lack of personal jurisdiction the lawsuit which GIB and USBA had filed against plaintiffs and Jones.

In November of 2010, the USPTO approved GB Analysts' application to register the mark and business name "U.S. Benefits Analysts." A competing registration filed by one of defendants has been abandoned. Nonetheless, defendants continue to actively use the mark and business name "U.S. Benefits Analysts" and to tell agents that defendants – not GB Analysts – own the mark and business name.

## **Analysis**

Under Rule 12(b)(6), defendants assert that plaintiffs have failed to state claims for breach of fiduciary duty (Counts VIII(a) and XI(a)), tortious interference with existing contractual relations (Count IX), tortious interference with prospective business relations (Count X) and tortious interference with an attorney-client relationship (Count XI(b)).

**I.      Breach Of Fiduciary Duty (Counts VIII(a) and XI(a)) against GIB**

Plaintiffs allege that GIB breached fiduciary duties to protect the interests of GB Analysts by (1) failing to keep records of GIB's non-compete and nondisclosure agreements, to pay GB Analysts for agents who attended GB Analysts training and to retain copies of VA Benefits System materials provided to agents during training sessions and (2) directing Rondoni to act in a manner contrary to plaintiffs' interests, including the filing and prosecution of the Minnesota state court lawsuit.  GIB asserts that the breach of fiduciary duty claims must be dismissed because plaintiffs have not sufficiently alleged facts which create an fiduciary duty.  GIB asserts that at most plaintiffs have alleged a normal business relationship between GB Analysts and GIB.

A fiduciary relationship may be created by contract or implied from the surrounding facts and circumstances.  Estate of Pingree v. Triple T Foods, Inc., 430 F. Supp.2d 1226, 1239-40 (D. Kan. 2006).  Plaintiffs rely on an implied fiduciary relationship, the existence of which depends on the facts and circumstances of each case. See Doc. #69 at 4 (citing Denison State Bank v. Madeira, 230 Kan. 684, 691, 640 P.2d 1235, 1241 (1982)).   Although the Kansas Supreme Court has not specifically defined a fiduciary relationship, it has set forth certain factors to consider in determining whether a fiduciary relationship exists:

> A fiduciary relationship impacts a position of peculiar confidence placed by one individual in another. A fiduciary is a person with a duty to act primarily for the benefit of another. A fiduciary is in a position to have and exercise, and does have and exercise influence over another. A fiduciary relationship implies a condition of superiority of one of the parties over the other.  Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary.

Denison, 230 Kan. at 692-93, 640 P.2d at 1241 (all factors need not be present to create fiduciary relationship).  The Kansas Supreme Court has stated that an "overriding consideration" is that "one may not abandon all caution and responsibility for his own protection and unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought

to be held liable as a fiduciary." See id. at 696, 640 P.2d at 1243-44.  This is particularly true when a party is fully competent and able to protect their own interests. See id. at 693, 640 P.2d at 1241.

Here, the complaint alleges facts to support only one of the relevant factors – that GIB was placed in charge of the property of GB Analysts, in that GIB agreed to collect payments for the VA Benefits System from agents and forward those payments to GB Analysts.  See id. at 692, 640 P.2d at 1241 (in fiduciary relationship, fiduciary placed in charge of property, interest or authority of the other); see also Capital Solutions, LLC v. Konica Minolta Bus. Solutions, No. 08-2027-JWL, 2012 WL 446936, at *10 (D. Kan. Feb. 5, 2012).  The complaint does not allege any other factors, however, which would contribute to a fiduciary duty.  It does not allege that GB Analysts and Jones, its principal, placed peculiar confidence in GIB; that GIB assumed a duty to act primarily for the benefit of GB Analysts; or that GIB was in a position of superiority over GB Analysts.  The complaint does not allege facts which – if true – would establish a fiduciary relationship.  The Court therefore finds that plaintiffs' claims for breach of fiduciary duty, as set out in Counts VIII(a) and XI(a), should be dismissed.

**II.**     **Tortious Interference With Existing Contractual Relationships (Count IX)**

Count IX asserts that defendants tortiously interfered with existing contractual relationships between plaintiffs and "various insurance agents and other businesses."  To set forth a claim of tortious interference with contract, plaintiffs must allege (1) the existence of a contract; (2) defendants' knowledge of the contract; (3) defendants' intentional procurement of a breach; (4) the absence of justification; and (5) damages resulting therefrom.  Burcham v. Unison Bancorp, Inc., 276 Kan. 393, 423, 77 P.3d 130, 150 (Kan. 2003); Dickens v. Snodgrass, Dunlap & Co., 255 Kan. 164, 168-69, 872 P.2d 252, 257 (1994).

Defendants seek to dismiss this claim because although plaintiffs have alleged a contract between plaintiffs and VA Benefits System insurance agents, i.e. the nondisclosure agreements, they

have not alleged damages resulting from that breach.  Plaintiffs, however, point out that although they have not yet ascertained the amount of such damages, they have alleged damages as a result of defendants' interference with their contracts with insurance agents.  The Court finds that defendants are not entitled to dismissal of Count IX.

### III.     Tortious Interference With  Prospective Business Relationships (Count X)

Count X asserts that defendants tortiously interfered with plaintiffs' prospective business relationships with various insurance agents and other businesses.  To set out a claim for tortious interference with prospective business relationships under Kansas law, plaintiffs must allege (1) the existence of a business relationship or expectancy with the probability of future economic benefit to plaintiffs (2) knowledge of the relationship or expectancy by defendants; (3) that except for the conduct of defendants, plaintiffs were reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendants; and (5) damages suffered by plaintiffs as a direct or proximate result of defendants' misconduct.  PulseCard, Inc. v. Discover Card Servs., Inc., 917 F. Supp. 1488, 1498 (D. Kan. 1996).

Defendants argue that the Court must dismiss plaintiffs' claim for tortious interference with prospective business relationships because plaintiffs have not alleged any prospective business relationships between plaintiffs and insurance agents.  Plaintiffs counter that they have sufficiently alleged existing contracts with program agents and relationships which had the probability of future economic benefit to plaintiffs.

The complaint alleges that plaintiffs' business relationships with the program agents resulted in plaintiffs receiving a portion of commissions from insurance product sales by program agents.  Plaintiffs have alleged that but for defendants' interference in requiring program agents to sign new nondisclosure agreements and to participate in the GIB VA Program, plaintiffs would have enjoyed the continued economic benefits of prospective insurance business being sold by their program

agents.  These claims are not conclusory, and the Court finds that plaintiffs have sufficiently  set forth a claim for tortious interference with prospective business relationships.  The Court therefore will not dismiss Count X.

**IV.**      **Tortious Interference With An Attorney-Client Relationship (Count XI(b))**

Finally, Count XI(b) asserts a claim for tortious interference with an attorney-client relationship.  Defendants argue that the Court must dismiss this claim because Kansas courts do not recognize a claim for tortious interference with an attorney-client relationship.  Indeed, this Court has  found no Kansas cases which recognize or decline to recognize such a cause of action.

Defendants assert that the "very gist and essence" of plaintiffs' claim is the allegation that they are secondarily liable for an attorney's breach of ethical duties to plaintiffs.  Newell v. City of Salina, 276 F. Supp. 2d 1148, 1159 (D. Kan. 2003) (court should examine "very gist and essence of plaintiff's cause" to determine if claim is actionable).  Defendants point out that Kansas courts have consistently held that neither a client nor an adverse party can collect damages from an attorney based solely on the attorney's breach of professional ethics.  See OMI Holdings, Inc. v. Howell, 260 Kan. 305, 325, 918 P.2d 1274, 1288 (Kan. 1996); Gatlin v. Hartley, Nicholson, Hartley & Arnett, P.A., 29 Kan. App.2d 318, 320, 26 P.3d 1284, 1286 (Kan. Ct. App. 2001).  Defendants argue that if an attorney cannot be held liable solely for his own breach of ethics, it is inconceivable that a Kansas court would permit a plaintiff to hold a third party secondarily liable for the same breach.

Plaintiffs respond that Count XI(b) simply states a claim for tortious interference with existing contractual relations, in this case an attorney-client relationship.  Plaintiffs point out that their tortious interference claim does not seek damages based on potential ethical violations by Rondoni.  Rather, they rely on defendants' conduct in directing Rondoni to act contrary to their interests and in breach of their attorney-client contractual relationship with Rondoni.  As so limited,

the Court finds that plaintiffs' tortious interference claim in Count XI(b) survives defendants' motion to dismiss.

**IT IS THEREFORE ORDERED** that <u>Defendants' Motion To Dismiss</u> (Doc. #61) filed November 14, 2011 be and hereby is **sustained in part and overruled in part**.  Plaintiffs' breach of fiduciary claims set forth in Counts VIII(a) and XI(a) be and hereby are **dismissed**.  All other claims remain in the case.

Dated this 28th day of June, 2012 at Kansas City, Kansas.

<u>s/Kathryn H. Vratil</u>
Kathryn H. Vratil
United States District Judge